**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0209-18T3

JUJUTSU, LLC,

      Plaintiff-Appellant,

v.

DIPALIE PROPERTY
MANAGEMENT, LLC,

      Defendant-Respondent.

_____

Submitted October 8, 2019 - Decided November 4, 2019

Before Judges Yannotti and Currier.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-3055-16.

Spector & Ehrenworth, PC, attorneys for appellant (Justin A. Jacobs, of counsel and on the briefs).

OlenderFeldman LLP, attorneys for respondent (Richard J. Angowski, Jr., of counsel and on the brief; Sean Rose, on the brief).

PER CURIAM

The parties disputed the division of profits from a property owned by defendant DiPalie Property Management, LLC. Plaintiff Jujutsu, LLC contended it was granted a fifty percent membership interest in defendant under an oral agreement, which was later memorialized in a written Membership Interest Purchase Agreement (MIPA). After finding the oral agreement violated the statute of frauds, and the MIPA lacked consideration, and was therefore unenforceable, the judge granted defendant summary judgment. Plaintiff appeals the August 2, 2018 order.

Paru Ghandi (Paru),[1] a member of plaintiff, a limited liability company formed in April 2010, was married to Falgun Dharia,[2] who was one of two members of RP-Flemington Property Management, LLC (RP-Flemington). Paru and Falgun did not have any interests in the other's LLC. Defendant has three members that share interests in the company: Dipalie Jariwalla (Jariwalla) possesses fifty percent, and two other individuals own the remaining interests.

The dispute arises from defendant's purchase and subsequent ownership of a property from RP-Flemington. Although defendant obtained financing for

---

[1]  As several of the individuals involved in this matter share surnames, we use their first names for the ease of the reader. We mean no disrespect.

[2]  Paru and Falgun later divorced.

A-0209-18T3

the purchase, it remained responsible for the $200,000 deposit. Paru, Falgun, and Jariwalla differ in their accounts of how and if the deposit was paid and the oral agreement concerning the deposit.

Defendant owed RP-Flemington the $200,000 deposit. But Jariwalla did not have the money. So, according to Paru, she and Jariwalla, after a "verbal conversation," agreed that Paru would forgive the $200,000 debt in exchange for plaintiff obtaining a fifty percent membership interest in defendant. Paru considered the $200,000 to be plaintiff's investment in defendant. Falgun corroborated his ex-wife's account of the conversation. Jariwalla confirmed there was an oral agreement but could not remember any details of it and could not remember if a deposit was paid.[3]

The oral agreement was not reflected in any of the September 30, 2009 closing documents for the property purchase. The sales contract provided that it was "INTENDED TO BE A LEGALLY BINDING CONTRACT," and that "[n]o prior or present agreements or representations [would] be binding upon [defendant] or [RP-Flemington] unless included in [the] [c]ontract." Paru's name is not on the sales contract. Plaintiff did not yet exist.

---

[3] The HUD settlement statement for the purchase reflects the payment of a deposit by defendant to RP-Flemington.

Following the closing, defendant issued plaintiff, prior to its formation in April 2010, eight checks, monthly from October 2009 through May 2010, totaling $10,500. Paru believed the checks were the monthly distribution for her fifty percent membership interest in defendant. Defendant disputes the purpose of the checks. Jariwalla states the payments were towards a future contract, but defendant stopped issuing them when plaintiff failed to carry out any of its obligations.

Jariwalla stated that after the purchase, plaintiff wanted a membership interest in defendant, and they agreed that plaintiff would:

> (a) . . . pay $221,867.55 to [defendant]; (b) . . . assume liability for 50% of [defendant's] debt including any debt associated with closing on the [p]roperty; and (c) . . . become signatory to all guaranties and[] . . . other obligations relative to any of [defendant's] debt including any debt associated with closing on the [p]roperty . . . .

Paru sought to memorialize the oral agreement she believed was in place with defendant, and an attorney initially drafted the MIPA in April 2010. The first clause of the MIPA states, that "in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged . . . [defendant] hereby transfers, conveys, assigns and delivers to [plaintiff] . . . a 50% membership interest" in

defendant. The MIPA does not mention the three conditions Jariwalla contends were imposed on plaintiff's membership interest, nor did it contain a specific monetary consideration figure.

The MIPA also contains an integration clause, providing: "This Agreement and the agreements specifically referred herein represent the entire agreement of the [p]arties with respect to the matters contemplated hereby, and there are no oral, written, electronic or other representations, warranties, understandings, or agreements with respect hereto except as expressly set forth herein."

The MIPA was not signed and notarized until September 14, 2010. Two days later, Jariwalla sent Paru an email with the subject line: "Dipalie Property Rent Income Update 10-01-09 to 08-31-2010." A profit and loss statement was attached to the email. The document noted that plaintiff had received $13,500 and the partners' draw was $13,500. Paru asserts that even though the checks she received from defendant were issued before this email was sent and before the MIPA was signed, they were intended to be her share of the partners' draw.

Jariwalla claims she signed the MIPA under the assumption that Paru would follow through with her verbal promises. She explained: "[Paru] had to take . . . responsibility . . . if [she] want[ed] to be a part of [defendant], one has

to take the responsibility of liability which has not been taken here. . . . [Paru] [n]ever came out with the money to buy the shares." Because Paru failed to comply with the verbal terms, Jariwalla contends defendant never transferred a membership interest to plaintiff.

After defendant failed to pay plaintiff any share of the profits from the rentals of the property, plaintiff instituted suit, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and violations of the New Jersey Revised Uniform Limited Liability Company Act (RULLCA), N.J.S.A. 42:2C-1 to -94.

Defendant moved for summary judgment, alleging the MIPA lacked consideration, rendering it unenforceable. Plaintiff did not pay the $221,867, did not assume fifty percent of defendant's debt obligations, nor did it sign any guaranties for those obligations. Plaintiff responded that the debt forgiveness from RP-Flemington of the $200,000 deposit defendant owed under the sales contract was the consideration for plaintiff's fifty percent membership interest.

In granting the motion, the judge found there was "[n]o evidence that there was a forgiveness of the debt. . . . [a]nd no evidence that RP Flemington assigned the debt." The judge also determined that the statute of frauds required the agreement to be in a signed writing. Lacking any written agreement, plaintiff

could not assert third party consideration. The judge equated the MIPA to a "handshake" because none of the terms plaintiff offered in exchange for a membership interest were documented in the agreement. In finding there were "no proof[s]," "no documents," and "no consideration," the trial judge concluded the MIPA was not a valid agreement, and therefore, was unenforceable. He granted defendant summary judgment on August 2, 2018.

We review the grant of summary judgment de novo, applying the same standard as the motion judge. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016) (citing Mem'l Props., LLC v. Zurich Am. Ins. Co., 210 N.J. 512, 524 (2012)). Providing all favorable inferences to the non-moving party, Rule 4:46-2(c), we must "determine whether a rational factfinder could resolve [an] alleged disputed issue in favor of the non-moving party . . . ." Perez v. Professionally Green, LLC, 215 N.J. 388, 405-06 (2013). A party opposing summary judgment, however, must "do more than 'point[] to any fact in dispute' in order to defeat summary judgment." Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (alteration and emphasis in original) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 529 (1995)).

7

"When a trial court's decision turns on its construction of a contract, appellate review of that determination is de novo." Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014) (citing Kieffer v. Best Buy, 205 N.J. 213, 222 (2011)). "If the language of a contract 'is plain and capable of legal construction, the language alone must determine the agreement's force and effect.'" Id. at 118 (quoting Twp. of White v. Castle Ridge Dev. Corp., 419 N.J. Super. 68, 74-75 (App. Div. 2011)).

Plaintiff argues on appeal that there was consideration for the MIPA – the oral agreement in which Paru agreed to forgive Jariwalla's debt. However, that agreement occurred prior to defendant's purchase of the property from RP-Flemington in 2009. The MIPA was not signed until September 2010. Therefore, Paru seeks to use past consideration to support plaintiff's entitlement to a fifty percent membership interest in defendant.

A contract is enforceable only if it is supported by consideration. Sipko v. Koger, Inc., 214 N.J. 364, 380 (2013) (citing Cont'l Bank of Pa. v. Barclay Riding Acad., Inc., 93 N.J. 153, 170 (1983)). "Consideration is the price bargained for and paid for a promise . . . [which] may take the form of either a detriment incurred by the promisee or a benefit received by the promisor." Cont'l Bank, 93 N.J. at 170 (first quoting Friedman v. Tappan Dev. Corp., 22

8

N.J. 523, 535 (1956); then citing Novack v. Cities Serv. Oil Co., 149 N.J. Super. 542, 549 (Law Div. 1977); and then citing 1 Corbin on Contracts §§ 121-22 (1963)).

However, "something which has been given before the promise was made, and, therefore, without reference to it, cannot, properly speaking, be legal consideration." Broad St. Nat'l Bank of Trenton v. Collier, 112 N.J.L. 41, 45 (Sup. Ct. 1933). Thus, it "is well recognized and universally enforced" that "past consideration is no consideration." Ibid.; see also New Brunswick v. Milltown, 191 N.J. Super. 467, 469 (Ch. Div. 1983) ("[T]here is no longer any consideration of any consequence flowing from [the defendant] . . . because its past consideration is insufficient to require [the plaintiff's] continued performance."). The alleged forgiveness of debt occurred a year before the MIPA was executed and cannot serve as consideration for that agreement.

Furthermore, the oral agreement is also unenforceable under the statute of frauds. N.J.S.A. 25:1-5(f) and (g) require an agreement by a creditor to forbear from exercising any contractual remedies, where the amount of the loan exceeds $100,000, be documented in a signed writing.

Although plaintiff acknowledges the oral agreement here was subject to the statute of frauds, it contends the agreement is nevertheless enforceable as it

falls within the partial performance exception to the statute. Plaintiff asserts the parties acted in accordance with the agreement when defendant sent plaintiff eight checks, when they signed the MIPA, and when defendant sent plaintiff a profit and loss statement.

We have recognized that "part performance of an oral agreement may take the agreement out of the statute of frauds." Lahue v. Pio Costa, 263 N.J. Super. 575, 599 (App. Div. 1993) (citing Cauco v. Galante, 6 N.J. 128, 137-38 (1951); Kufta v. Hughson, 46 N.J. Super. 222, 227-29 (Ch. Div. 1957)); see also Botis v. Estate of Kudrick, 421 N.J. Super. 107, 120 (App. Div. 2011). However, "[n]ot all performance will trigger the doctrine . . . ." Lahue, 263 N.J. Super. at 599 (citing Deutsch v. Budget Rent-A-Car, 213 N.J. Super. 385, 388 (App. Div. 1986)). The performance "must be 'clearly referable to the execution of the contract and not to some other relation,' and performance of matters that are merely ancillary to an oral agreement, even if costly, are not sufficient." Id. at 599-600 (first quoting Delnero v. Serra, 2 N.J. Super. 350, 352 (Ch. Div. 1949); then citing DeMarco v. Estlow, 18 N.J. Super. 30, 34 (Ch. Div. 1952)).

Plaintiff has not established that the checks issued prior to the MIPA demonstrate partial performance. The checks do not refer to the property, the sales contract or the MIPA. Because the oral agreement and the checks pre-

dated the MIPA, they could not be "clearly referable" to it. In addition, neither the sales contract nor the MIPA referred to any prior or oral agreement. To the contrary, both documents included clauses advising that no other agreements would be binding on the parties.

We briefly address plaintiff's contention that the trial judge failed to consider parol evidence in determining the MIPA lacked consideration. Generally, "the parol evidence rule prohibits the introduction of evidence that tends to alter an integrated written document." Chance v. McCann, 405 N.J. Super. 547, 563 (App. Div. 2009) (quoting Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 268 (2006) (citing Restatement (Second) of Contracts § 213 (1981)). Although "[e]xtrinsic evidence may be used to uncover the true meaning of contractual terms[,] [i]t is only after the meaning of the contract is discerned that the parol evidence rule comes into play to prohibit the introduction of extrinsic evidence to vary the terms of the contract." Conway, 187 N.J. at 270 (citing Atl. N. Airlines, Inc. v. Schwimmer, 12 N.J. 293, 304 (1953)). "[T]here is a 'distinction between the use of evidence of extrinsic circumstances to illuminate the meaning of a written contract, which is proper, and the forbidden use of parol evidence to vary or contradict the acknowledged terms of an integrated contract.'" YA Global Invs., L.P. v. Cliff, 419 N.J. Super.

1, 12 (App. Div. 2011) (quoting <u>Garden State Plaza Corp. v. S.S. Kresge Co.</u>, 78 N.J. Super. 485, 497 (App. Div. 1963)).

The MIPA included an integration clause. Therefore, the trial judge could only look to parol evidence to illuminate the meaning of the MIPA, not to change or contradict the contract's terms. The judge's reference to the oral agreement as well as defendant's assertions regarding the conditions of membership interest demonstrate he considered the proffered parol evidence. However, as reasoned above, the oral agreement was unenforceable under the statute of frauds. The MIPA was not supported by consideration. In the absence of a contract, plaintiff's remaining claims also fall. We discern no error in the judge's grant of summary judgment to defendant.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0209-18T3